UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,           )
    Plaintiff,                      )
                                  )     CRIMINAL NO. 06-10339-DPW
         v.                          )
                                    )
STEVEN CHILDS,                      )
    Defendant.                      )
                                    )

MEMORANDUM AND ORDER
April 4, 2008

    Defendant Steven Childs has been charged in a one-count indictment with possession of a firearm and ammunition after having been convicted of a felony offense, in violation of 18 U.S.C. § 922(g)(1).  He seeks to suppress certain evidence developed during three separate incidents involving investigations by the Brockton police: (1) the fruits of a traffic stop during which he was detained on June 29, 2006, (2) items seized during a June 29, 2006 search of an apartment after the traffic stop, and (3) statements he made to the Brockton police in connection with a separate incident on July 5, 2006.

## I.  FINDINGS OF FACT

    I make the following findings of fact on the basis of the testimony and related exhibits offered during the three days of hearings on the motion to suppress.

A.  *The June 29, 2006 Tip*

    At approximately 7:20 p.m. on June 29, 2006, Detective James

Smith of the Brockton Police Department received information from a confidential informant ("CI") through Juvenile Probation Officer William Cavanaugh that Steven Childs, a black male, 6' 1" tall, was carrying a black knapsack containing an Uzi machine gun with a big magazine.  The CI stated that Childs and a black male were driving around Brockton in a white Mercedes Benz with a license plate of 5ZPGI.  The CI further stated that the car might be at 34 Coburn Street in Brockton.

Detective Smith drove to Coburn Street where he observed a white Mercedes matching the description provided by the CI parked across the street from 34 Coburn Street.  Smith observed the license plate of the car and found it to be a partial match of that provided by the CI.  He also noted that there were two black men in the car.  Smith recognized Steven Childs, whom he had seen in connection with another investigation, as one of the men. Smith radioed the location of the car to other officers who subsequently came to the area.  Smith then observed Childs and the other man get out of the car and enter 34 Coburn Street.[1] Neither man was seen carrying the black bag the CI had described.

B.   *The June 29, 2006 Traffic Stop*

---

[1]Three apartment units were located at 34 Coburn Street, including the second floor residence of Veronica Tubbs and her three children.  During June 2006, Childs had spent some time visiting and staying overnight at 34 Coburn Street. Specifically, Childs stayed at Tubbs' apartment "sporadically", spending between three to four nights a week there and visiting the apartment on other days, from mid-June until the night of his arrest on June 29, 2006.

At approximately 9:20 p.m., after conducting surveillance for about two hours, Smith saw three individuals leave 34 Coburn Street and get into the white Mercedes.  None of them was carrying a bag when they left the house.  The car contained Childs, who was riding in the front passenger seat, Andrew Brewer, who was the driver, and a woman who was riding in the backseat.  The Mercedes started moving down the street and several unmarked police cars followed.

Approximately ten minutes later, the police conducted a motor vehicle stop because the car had swerved across the solid double yellow line on two occasions on Battles Street.  Other police cars and officers arrived shortly after the initial stop.  The Mercedes was blocked front, back and on the side by police cars.  Six to eight police officers then approached the car.  Half of the officers had their guns drawn.  The officers demanded that the passengers in the car show their hands.  As the police approached the car, Officer Daniel Matukas observed that Childs was moving his left hand downward near the console.  Matukas also saw Childs throw a small bag towards the back seat.  Matukas suspected the bag contained contraband.  It was not until Matukas made a third demand to the passengers to show their hands that Childs and Brewer put their hands up.

All three passengers were removed from the car and held to the ground.  Police then searched the passengers.  A search of the vehicle was also conducted and the bag that Matukas observed

Childs throw was found.  Childs was arrested for possession of
marijuana.  Childs received his *Miranda* rights and indicated that
he understood those rights.  The police, however, did not find
the black bag or firearm in the car.

C.   *The June 29, 2006 Search at 34 Coburn Street*

After the traffic stop and arrests, several officers,
including Detective Erik Hilliard, Lieutenant LaFratta, and
Detective Jeffery Costello, went to 34 Coburn Street to look for
the black bag and gun.  Hilliard arrived first.  Hilliard
informed Tubbs, the second-floor tenant, *see* note 1 *supra*, that
the police were conducting a narcotics investigation even though
the real purpose of their investigation was to locate the firearm
the CI had described.  Hilliard then asked Tubbs about Childs.
Tubbs said that Childs had stayed in her apartment for about a
week.  She said she allowed him to stay in her apartment because
he told her that he had no where else to go.  She also indicated
that she thought Childs and his friends were selling drugs out of
a vacant third-floor apartment at 34 Coburn Street.  Hilliard
checked the third-floor apartment, found no occupants or
contraband, and returned to the second floor.  By the time
Hilliard returned, LaFratta and Costello had arrived.

Hilliard introduced LaFratta to Tubbs.  When asked, Tubbs
stated that Childs had a black pull-string bag that she thought
he might put his toiletries in.  She also told the police that

4

the black bag was in her daughter's bedroom.  She never indicated

to the police that the bag was hers[2] or that she had control over

it.  Hilliard asked her if the bag could be "where [Childs] puts

his narcotics?"  Tubbs responded she did not know.  At that

point, the police presented Tubbs with a written consent form

which she reviewed, signed, and dated.  Tubbs proceeded to direct

the police to her daughter's bedroom and indicated the bag was in

the closet.[3]

---

[2]Although the police did not develop this information before
conducting the search, Tubbs had never looked inside of the bag
and she did not have direct knowledge regarding its contents.
She never touched or handled the bag or moved it.  She never
discussed with Childs what he was going to do with the bag.

[3]Tubbs' testimony regarding Childs, the bag, and her
apartment is not entirely consistent.  On the one hand, Tubbs
stated that Childs took the bag with him when he left her
apartment.  For example, she testified that "[h]e would take [the
bag] with him when he got up to leave, he would take it with
him."  Tubbs also told the police the night of the search that
the "bag belonged to him, and that usually when he leaves he
takes it with him, but, you know, it comes and goes with him."
However, Tubbs also indicated that Childs left the bag at her
apartment.  Asked, for example, "When was the first time you
noticed a bag that Stephen Childs had with him?" she answered, "I
don't know the exact date, but I do remember him asking me was it
okay for him to leave a bag there and me saying yes."  On the
night of the search, Tubbs knew the bag was in her daughter's
closet because, as she testified, "at that point I knew that he
was keeping it in there, because he'd say can he go get the bag
out of the closet.  When [her daughter] wasn't home, he would ask
can he go in there and get the bag, and I'd say yes."  Tubbs
stated she gave Childs permission to store the bag in her house;
she knew that he stored the bag in her daughter's closet, and
knew that he stored the bag in the closet even when he wasn't at
the house.  As she testified, "once my daughter put it into her
closet, that's where he kept it.  And he could go and get it and
put it back at his leisure, and he didn't check in every time
that he went and got it or check out every time he picked it up."

After Tubbs led the police to her daughter's bedroom, Costello went inside the room.  Tubbs' daughter was sleeping in the room at that time.  The closet door was partially open. Costello opened the door the rest of the way and observed a pile of clothes in the bottom of the closet.  Because of the clothes, the bag was not immediately visible in the closet even after the closet door was fully opened.  Costello moved some clothes and found the bag.  The drawstring was pulled closed when he discovered it.  Before Costello picked up the bag he did not make any determinations about what was inside of the bag and could not discern anything about the contents of the bag from visible observation alone.

When Costello picked up the bag he observed that it was heavy.  At this point, Costello still could not make any determination regarding what the bag contained.  He proceeded to feel the outside of the bag.  Based on this external touching, Costello believed a firearm was inside.  He opened the bag and saw a firearm, a magazine that had sixteen live rounds of ammunition in it, and a baseball batting glove inside.  Costello then handed the entire bag to Officer Hilliard, who secured the items.  The police also showed Tubbs the contents of the bag and told her the firearm was a machine gun.  Upon learning this, Tubbs was extremely surprised and started shaking and crying. She expressed concern for the safety of her children as a result of the firearm being in the closet.

Childs was informed of the gun's discovery while in custody. Upon hearing the news, Childs became visibly upset and began to breathe rapidly.  He then asked for water and was provided a glass by Smith.

D.    *The July 5, 2006 Arrest*

Less than two weeks later, on July 5, 2006, Childs was arrested in Brockton in an unrelated incident after police responded to a report of domestic violence occurring at 42 Ford Street.

At approximately three o'clock in the morning Officer Richard Gaucher arrived at 42 Ford Street and saw a man and a woman standing in the driveway in the midst of a heated argument. Officer James Baroud followed shortly thereafter.  When the man saw that police had arrived, he ran onto a side porch, leaned forward, and bent just out of sight.  Shortly thereafter, the man returned to the driveway.  Gaucher identified the man as Childs. Gaucher proceeded to engage Childs in conversation.  Gaucher observed him to be very nervous and acted "like he was going to run."  His hands were also shaking and he was sweating.  Gaucher proceeded to take Childs into custody for investigative purposes and handcuffed him.

Gaucher then spoke with the woman.  Visibly upset, the woman said she was trying to avoid getting Childs into trouble and just got nervous when "a man that size pushes her around."  Baroud

checked for warrants on Childs and discovered he was the subject
of an active arrest warrant.

Gaucher then went to the area of the porch where he saw
Childs lean over.  He discovered eight pieces of crack cocaine on
top of a trash bag.  Gaucher then told Childs, who was standing
with Baroud in the driveway, that he was going to be placed under
arrest.  Gaucher also informed Childs of the charges for the
outstanding warrant, for domestic violence, and for crack
cocaine.  Childs was then escorted into a police cruiser and
Gaucher read him his *Miranda* rights from a *Miranda* card.  While
Childs repeatedly asked questions about what he was charged with,
he also said he understood his *Miranda* rights.

After his arrest, Childs was taken to the Brockton police
department.  On the way to the station, Gaucher noticed Childs
"fidgeting and moving like he was trying to hide something."
Childs was handcuffed at the time, but Gaucher believed he was
trying to tuck or hide something in his pants.  Gaucher asked him
to stop moving.  After arriving at the station, Gaucher escorted
Childs out of the cruiser.  Gaucher observed Childs reach for his
rear anal region on several occasions.  When questioned, Childs
denied that he was hiding anything in his pants.  The two
officers then proceeded to strip search Childs and his anal
cavity area.  Officer Gaucher subsequently discovered and removed
two plastic baggies from that area.  One baggie appeared to

8

contain marijuana and the other had what appeared to be cocaine and pieces of crack cocaine in it.   Following the police discovery of the baggies, Captain Nordeen read Childs his *Miranda* rights again.

At that point, Childs became very upset.   Childs stated he was on probation and could not do a "two year mandatory" sentence.   He also pled with the officers to "make it go away." Gaucher told Childs he had an open case and his "best chance is to work with Detective Smith," the officer who arrested him on the firearm charge.   Additionally, Gaucher suggested that Smith might be able to "work out a deal with him."   Childs responded he was not worried about the gun case because "his boy was going to take the rap for him on that."   Gaucher then asked who Childs' boy was.   Childs refused to answer the question.

After the baggies were discovered, Childs told the police that he had ADHD and he was bipolar.   Gaucher viewed those statements as simply a ploy for sympathy.   Gaucher also concluded that Childs understood all of the conversations with police officers throughout the course of the night.   Gaucher testified that Childs conversed with police for forty-five minutes in total that night and was "competent."

## II.   CONCLUSIONS OF LAW

A.   *Suppression of the Fruits of the June 29, 2006 Arrest*

1.   The Traffic Stop

9

Childs contends that the search, seizure, and arrest following the June 29, 2006 traffic stop should be suppressed because the traffic stop was unreasonable.  He further asserts that the illegality of the stop tainted all related evidence recovered by the police thereafter.

a.   Fourth Amendment Standards for Traffic Stops

Generally, the police may lawfully stop a vehicle if they "have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). Alternatively, the police may make an investigative vehicle stop as long as the stop is justified by "a reasonable and articulable suspicion of criminal activity." *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001).  Reasonable suspicion is measured by balancing "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley*, 469 U.S. 221, 228 (1985).  Because reasonable suspicion "defies precise definition[, i]ts existence must be determined case by case, and that determination entails broad-based consideration of all the attendant circumstances." *United States v. Chhien*, 266 F.3d at 6.

Police are also granted flexibility in their responses and actions during a traffic stop.  The reasonableness of an officer's actions after a stop will be evaluated on the basis of

10

the circumstances that led to the stop in the first place and
also on information the officer learns as the stop progresses.
*United States v. Sowers*, 136 F.3d 24, 27 (1st Cir. 1998).  Thus,
"while an officer's actions must bear some relation to the
purpose of the original stop, he may shift his focus and increase
the scope of the investigation by degrees if his suspicions mount
during the course of the detention."  *United States v. Chhein*,
266 F.3d at 6.

    b.   Childs' Argument

    Childs' contends that Brockton police stopped the Mercedes
in order to arrest Childs and search for the gun, not because of
a Massachusetts motor vehicle law violation.  To support this
position, Childs claims that the police conduct that followed the
stop far exceeded that which would have been permitted by the
putative cause of the stop.  Specifically, after the Mercedes was
stopped three police cars blocked the car and six to eight police
officers approached the vehicle, half of them with their guns
drawn.

    I find Childs' argument unpersuasive.  Based on the
undisputed testimony of Officer Matukas, I conclude that a
violation of Massachusetts motor vehicle laws occurred when the
Mercedes crossed the double yellow line on two separate
occasions.  This violation was sufficient for police to stop the
vehicle.  *United States v. Chhien*, 266 F.3d at 6 (explaining

police "clearly had cause to stop the [car] for tailgating and operating an automobile equipped with blue-tinted lights"); *United States v. Soares*, 451 F.Supp.2d 282, 287 (D. Mass. 2006) (holding a police stop of a car was valid because the car was driving without headlights and had either a dysfunctional taillight or brake light); *United States v. Starks*, 301 F.Supp.2d 76, 81-82 (D. Mass. 2004) (holding police had probable cause to stop a car because the rear license plate was not illuminated).

The arrest and search of the car following the initial stop were also appropriate based on Childs' and Brewer's actions. After stopping the car, the police repeatedly instructed Childs and Brewer to show their hands but the men did not do so. Additionally, the police observed Childs throw a bag of suspected contraband into the backseat as they approached the vehicle. Based upon all of the evidence, I find that post-stop-conduct by Childs and Brewer justified their subsequent arrests and the search of the vehicle. Even if the police had initially pulled the car over for a traffic violation and were merely suspicious that the car might contain Childs' bag, the subsequent actions of the passengers within the car allowed the officers to increase the scope of the investigation.

While I conclude the stop, search, and arrest do not constitute a Fourth Amendment violation, I note two aspects of the police actions suggest a broader investigative purpose than

12

traffic control at the outset.  First, the number of cars and officers present at the stop appears to be disproportionate to the task of stopping the vehicle.  Of course, because the police knew that Childs was in the car and that he might be carrying a firearm, the number of officers and cars involved in the stop can be viewed as a safety precaution in the case of potential violence.  Thus, the manner in which the number of cars and officers were used may have been intimidating, but not unnecessarily overbearing nor improper.  Second, Officer Hilliard's testimony regarding the inevitability of the stop of the Mercedes and arrest of Childs does suggest that the stated reason for stopping the Mercedes may have been pretextual.  At the suppression hearing Hilliard testified: "[W]e did surveillance on that vehicle, the white Mercedes.  We were going to take him away from [34 Coburn Street] for obvious reasons.  *At some point, he was going to be stopped and arrested*." (emphasis added).  While this testimony demonstrates the subjective intent of the police, ultimately that is immaterial.  As an objective matter, the operation of the car did violate the law and thus the police had a proper basis for stopping the car.  Therefore, I will deny Childs' motion to suppress the fruits of the stop.

B.   *Suppression of Items Obtained at 34 Coburn Street*

    1.   Identifying the Proper Issue

The Government contends that Tubbs had authority to consent

to a search of her apartment at 34 Coburn Street generally.  The Government is correct in this regard.  Childs did not have a reasonable expectation of privacy in the entire apartment.  Tubbs had the authority to allow the police to search the apartment because she at a minimum had common authority over the entire area.  *See United States v. Matlock*, 415 U.S. 164, 170 (1974) (explaining "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared").

However, the central issue here is whether Childs had a reasonable expectation of privacy *in the bag* that was kept in Tubbs' home, not whether Childs had a reasonable expectation of privacy *in the apartment generally*.  *See United States v. Rodriguez*, 888 F.2d 519, 523-24 (7th Cir. 1989) (explaining the relevant inquiry was not whether the third party had authority to consent to a search of a room, but whether the third party had authority to consent to a search of containers within the room); *United States v. Davis*, 332 F.3d 1163, 1167 (9th Cir. 2003) (explaining that "the question before us is not whether [defendant] had a legitimate expectation of privacy in the contents of the apartment generally, but whether he could reasonably believe that the contents of his gym bag [located within the apartment] would remain private"); *United States v. Smairat*, 503 F.Supp.2d 973, 987 (N.D. Ill. 2007) ("Courts must

14

independently consider whether a third party has the authority to
consent to a search of a residence and whether the third party
has authority to consent to particular containers within that
residence.").

    With the proper issue in focus, I turn to the relevant law
and facts to determine if the search of the bag was proper.

    2.   Childs' Expectation of Privacy in the Bag

    In order for Childs to establish standing to contest a
search or seizure on Fourth Amendment grounds, he must establish
that he has a legitimate and reasonable expectation of privacy in
the relevant object.  *United States v. Dunning*, 312 F.3d 528, 531
(1st Cir. 2002) (per curiam).   The Supreme Court has established
a two prong test in order to determine whether a legitimate
expectation of privacy exists.  *Smith v. Maryland*, 442 U.S. 735,
740 (1979).   The first prong asks whether the individual
exhibited an actual, subjective expectation of privacy; the
second prong asks whether that subjective expectation can be
recognized as reasonable by society.  *Id.*

    The First Circuit has identified several relevant factors
for determining whether a defendant had a reasonable expectation
of privacy in an item or place:

        [O]wnership, possession, and/or control; historical use of
        the property searched or the thing seized; ability to
        regulate access; the totality of the surrounding
        circumstances; the existence or nonexistence of a subjective
        anticipation of privacy; and the objective reasonableness of
        such an expectancy under the facts of a given case.

15

*United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir. 1991)

(quoting *United States v. Aguirre*, 839 F.2d 854, 856-57 (1st Cir.

1998)).  The burden of establishing a reasonable expectation of

privacy is on the defendant.  *United States v. Dunning*, 312 F.3d

at 531.

 a.   Childs' Subjective Expectation of Privacy

 Determining Childs' subjective expectation of privacy must

be based on circumstantial evidence; he chose not to testify at

the suppression hearing.  There are several pieces of relevant

evidence.  Childs did not inform Tubbs of the content of the bag

or expressly authorize her to look in the bag.  From this, an

inference can be drawn that "he sought to preserve the contents

of his [] bag as private."  *United States v. Waller*, 426 F.3d

838, 844 (6th Cir. 2005).  Childs also apparently owned the bag

and Tubbs identified the bag as Childs' possession.  Both of

these facts indicate that he had a subjective expectation of

privacy in the bag.

 Childs also left the closed bag in a bedroom closet.[4]  By

closing the bag and putting it in a place away from plain view,

Childs "manifest[s] an expectation that the contents would remain

free from public examination."  *United States v. Waller*, 426 F.3d

_____

 [4]He may also have covered the bag with clothes.  The police
found the bag underneath a pile of clothes in the closet.
Testimony did not indicate whether Childs covered the bag himself
or the clothes had been put there by another member of the Tubbs'
household.

at 844 (determining that defendant had a subjective expectation
of privacy in part because he "left [a] bag zipped, closed, and
stored in the bedroom closet of the apartment"); *see also United
States v. Haydel*, 649 F.2d 1152, 1154-55 (5th Cir. 1981) (finding
defendant had reasonable expectation of privacy in gambling
records stored under his parents' bed, even though "he did not
reside regularly at his parents' home, he kept clothing there and
had occasionally remained overnight"); *United States v. Davis*,
332 F.3d at 1168 (concluding defendant had reasonable expectation
of privacy in the items in his gym bag which he "stored under the
bed in an apartment where he sleeps and keeps his belongings").
Based on the totality of circumstances, I find that Childs
"demonstrate[d] that he sought to preserve the contents of the
[effects] as private" and thus established a subjective
expectation of privacy.  *United States v. Yang*, 478 F.3d 832, 835
(7th Cir. 2007).

    b.   The Reasonableness of Childs' Expectation of Privacy

     "[A] person generally has an expectation of privacy in
items he places in a closed container."[5]  *United States v. Meada*,

_____

     [5]While the First Circuit has made clear that a person has an
expectation of privacy in containers, there are exceptions to
this general rule.  Specifically, containers that "so betray
their contents . . . abrogate any such expectation."  *United
States v. Meada*, 408 F.3d 14, 23 (1st Cir. 2005).  "The contents
of [these types of] containers are treated as being in plain
view."  *Id.*  "[S]ome containers (for example a kit of burglar
tools or a gun case) by their very nature cannot support any
reasonable expectation of privacy because their contents can be

408 F.3d 14, 23 (1st Cir. 2005).  "A person does not forfeit that expectation of privacy merely because the container is located in a place that is not controlled exclusively by the container's owner."  *United States v. Fultz*, 146 F.3d 1102, 1105 (9th Cir. 1998); *see also United States v. Botchway*, 433 F.Supp.2d 163, 170 (D. Mass. 2006).

Generally, the idea that a person has a expectation of privacy in a closed, personal container left in another person's home with permission of the permanent resident is reasonable.[6] *United States v. Waller*, 426 F.3d at 844; *see also United States v. Davis*, 332 F.3d at 1168; *United States v. Fultz*, 146 F.3d at 1105.  For example, in *United States v. Infante-Ruiz*, 13 F.3d 498, 501 (1st Cir. 1994), the defendant left an unlocked briefcase in the trunk of a car for "a period of some days" and

---

inferred form their outward appearance." *Arkansas v. Sanders*, 442 U.S. 753, 765 n.13 (1979).  Additionally, "in some cases the contents of a package will be open to 'plain view,' thereby obviating the need for a warrant."  *Id.*
    The bag at issue does not fit within this exception.  It was a black Nike pull-string bag.  There is no evidence that suggests the bag had special markings or any other indicia to indicate it contained a firearm.  Moreover, the bag was closed.  Costello testified that he could not make any determinations about what was inside of the bag and could not discern anything about the contents of the bag from visible observation alone.  Thus, the bag was different from burglar tools or a gun case and does not fit into any recognized exception.

    [6]As noted, Note 3, *supra*, Tubbs' testimony regarding Childs, the bag, and the apartment is, in certain particulars, somewhat inconsistent.  However, Tubbs consistently stated that the bag was in her daughter's bedroom closet with her permission.

allowed "others to place possessions of their own inside it."
*Id.*   Nevertheless, the First Circuit concluded that he had a
legitimate expectation of privacy in the briefcase because his
actions "did not reveal a willingness . . . to 'expose' such
items to the public."   *Id.*   The court also found it illuminating
that a third party "indentifi[ed] . . . the briefcase as
belonging to [defendant]."   *Id.*   The fact that others were
allowed access to the unlocked briefcase and felt "entitled to
place items of their own within it" did not change the First
Circuit's analysis.   *Id.* at 501.   Because the defendant had not
"abandoned the briefcase, relinquished authority over it, or left
it open to public inspection and consumption," he maintained a
reasonable expectation of privacy over the briefcase.   *Id.*
(internal quotations omitted).

   In this case, Childs did not permit Tubbs to put her own
possessions in his bag or relinquish authority over the bag in
any other way.   Similarly, despite the Government's claims to the
contrary, the evidence does not suggest that Childs abandoned the
bag at Tubbs' home.[7]   Thus, I find Childs' expectation of privacy
was one that society would deem reasonable.

   3.   Tubbs' Common Authority Over the Bag

   The next relevant issue is whether Tubbs had authority to

---

[7]Abandonment is discussed below in Part II, Section B(4)(b).

consent to the search of the bag.  The Government bears the
burden of establishing the validity of a third party's consent
when a warrantless search is conducted.  *Illinois v. Rodriguez*,
497 U.S. 177, 181 (1990).  To carry its burden, the Government
must establish that Tubbs had either actual or apparent authority
to consent.  *United States v. Botchway*, 433 F.Supp.2d at 171.

a.   Actual Authority

When the Government seeks to justify a warrantless search by
proof of third-party consent, it "may show that permission to
search was obtained from a third party who possessed common
authority over or other sufficient relationship to the premises
or effects sought to be inspected."  *United States v. Matlock*,
415 U.S. at 171.  Common authority, in turn, rests "on mutual use
of the property by persons generally having joint access or
control for most purposes."  *Id.* at n.7.  However, "ownership and
control of property does not automatically confer authority over
containers within it."  *United States v. Salinas-Cano,* 959 F.2d
861, 865 (10th Cir. 1992).

In this case, the pertinent inquiry is whether Tubbs had
mutual use of and joint access to the bag.  This case is similar
to *United States v. Botchway*, where Judge Saylor found that a
third party lacked actual authority to consent to a search of
defendant's locked, soft-sided briefcase that was in the trunk of
a car the third party was riding in.  The third party in *Botchway*

20

lacked authority because "the briefcase and its contents belonged
to [the defendant]," there was "no evidence that [the defendant]
shared access or control over the briefcase with any other
person," and the defendant "did not abandon the briefcase,
entrust it to another, or otherwise relinquish authority over it
in any respect." *Id.* at 170.

Analogously, in this case, the bag belonged to Childs, there
was no evidence he shared control of the bag with Tubbs[8], and
Childs did not abandon the briefcase, entrust it to another, or
otherwise relinquish authority over it.[9]  These facts satisfy me
that Tubbs lacked actual authority to consent to the search.
*United States v. Waller*, 426 F.3d at 845-46.  Additionally, Tubbs
did not know what Childs kept in the bag, ask him what he kept in
the bag, or take any other affirmative steps to determine the
contents of the bag.  When pressed by my questioning, Tubbs
suggested that she thought she had authority to look in the bag
if she wanted to.  I find this post-hoc assertion of authority to
be unpersuasive in light of her earlier testimony.  When I
originally asked her the same question, she testified that she

---

[8]Tubbs did, however, state that she saw Brewer with the bag.
However, this fact is not relevant to whether Tubbs possessed
actual authority over the bag.

[9]I again note that in her testimony Tubbs said that she saw
Brewer with the bag on one other occasion.  However, this remark
was not developed during the evidentiary hearing and I cannot
conclude on this basis alone that Childs relinquished meaningful
control over the bag to another person.

thought she had the right to look in the bag because "had [she] looked in it, we probably wouldn't be here today."

This case also bears resemblances to a situation Justice O'Connor described in *United States v. Karo*, 468 U.S. 705, 726 (1984) (O'Connor, J., concurring).  She observed that when a "guest in a private home has a private container to which the homeowner has no right of access[, t]he homeowner who permits entry into his home of such a container effectively surrenders a segment of the privacy of his home to the privacy of the owner of the container."  *Id.*  In these situations, "the homeowner . . . lacks the power to give effective consent to the search of the closed container."  *Id.*  While her testimony was not entirely consistent regarding Childs and the bag, Tubbs did consistently state that she gave Childs permission to store his bag in her daughter's closet.  This too suggests that Tubbs did not have joint access to or mutual use of the bag.  Because Tubbs did not have mutual use of or joint access to the bag for most purposes, she lacked actual authority to consent to the search.

   b.   Apparent Authority

In the absence of actual authority, a third party's consent to search is valid if "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had [actual] authority over the premises" or objects.  *Illinois v. Rodriguez*, 497 U.S. at 188.

22

However, "[w]here the circumstances presented would cause a person of reasonable caution to question whether the third party has mutual use of the property, 'warrantless entry without further inquiry is unlawful[.]'" *United States v. Waller*, 426 F.3d at 846 (quoting *Illinois v. Rodriguez*, 497 U.S. at 188-89)). When determining whether a third party had apparent authority to consent to the search, a court must assess the "totality of the circumstances." *United States v. Meada*, 408 F.3d at 22.

*Botchway* is also instructive in this context.  There Judge Saylor concluded that the third party also lacked apparent authority over the briefcase.  He found that no reasonable inference of authority could be made because the police officer "did not ask, and was not told, to whom the briefcase belonged." *United States v. Botchway*, 433 F.Supp.2d at 171.  The police officer merely concluded that the "[third party] had authority over its contents, notwithstanding the fact that the briefcase bore no identification and the car contained two other passengers." *Id.*  Put simply, "[a]t the point that [the police officer] picked up the briefcase and unzipped it, he had no reasonable basis for concluding that it belonged to [the consenting party]." *Id.*

Just as in *Botchway*, when Costello found the bag he had no reasonable basis for believing that Tubbs had joint access to or common authority over it.  The police went to 34 Coburn Street

23

for the purpose of searching for Childs' black bag.  After they arrived at the apartment, Tubbs informed the officers that Childs kept a black bag in the apartment.  While Tubbs clearly indicated that she lived in the apartment, she did not disclose any facts that would support a reasonable belief by the police that she had apparent authority over the bag.  She never indicated that the bag was hers or that she knew what the contents of the bag were. In fact, Tubbs' reaction when learning the contents of the bag strongly suggests that she did not previously know what was in it.  The police did not ask her any questions to determine her relationship with the bag.  Based on the information available to them, it was entirely unclear whether Tubbs had access or control over the bag.  In uncertain situations, police may not simply assume that a third party has authority over an item, but rather must conduct sufficient inquiry to determine if authority exists or not.  *See*, *e.g.*, *United States v. Kimoana*, 383 F.3d 1215, 1222 (10th Cir. 2004) ("[W]here an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent"); *United States v. McCoy*, 1999 WL 357749, at *10 (6th Cir. May 12, 1999) ("If the [police] do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent, then warrantless entry is unlawful without further inquiry"); *United States v. Waller*, 426 F.3d at 847.

24

Consequently, the Government has not met its burden for establishing that Tubbs had apparent authority to consent to the search.

        4.   <u>Other Justifications</u>

        The Government alternatively contends that the search of the bag was justified on other grounds.

        a.    The Plain Feel Doctrine

        The Government suggested that the search did not violate the Fourth Amendment because Costello's manipulation of the outside of the bag before opening it fell within the scope of the plain feel exception.  The plain feel exception has its roots in *Terry v. Ohio*, 392 U.S. 1 (1968), in which the Supreme Court held that a police officer may conduct a pat-down or frisk search of an suspicious individual believed to be armed and presently dangerous.  *Id.* at 24.  In *Terry*, the Court limited the applicability of pat-downs and frisks to those instances in which the police can justifiably *stop and detain persons* reasonably suspected of possible criminal behavior.  *Terry v. Ohio*, 392 U.S. at 22.  In addition, the scope of a *Terry* protective search is centered around the safety of the officer or others in the area.  That is, pat-downs and frisks are only permissible when "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  392 U.S. at 27; *see also Michigan v. Long*, 463 U.S. 1032, 1049

25

(1983); *Ybarra v. Illinois*, 444 U.S. 85, 92-93 (1979); *Adams v. Williams*, 407 U.S. 143, 146 (1972).

I do not find *Terry* applicable to the search at 34 Coburn Street. *Terry* searches involve the forcible stop and limited search of persons based upon a reasonable suspicion of criminal behavior when no probable cause exists. *See United States v. Dickerson*, 508 U.S. at 373; *Place*, 462 U.S. at 703. *Terry* however has not been extended to pat-downs of containers in warrantless searches such as the one at issue here. The Government cites *Dickerson* to support its contention that police can conduct a pat-down of a container and seize it if its contents are revealed to be contraband, but *Dickerson* does not stand for this proposition. Rather, in that case the Supreme Court suggested that pat-down searches of individuals would be permissible if "a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent." *United States v. Dickerson*, 508 U.S. at 377.

The Government suggests that when police have reasonable suspicion that personal effects contain contraband the Fourth Amendment allows for a seizure and *Terry*-frisk of the property. While the Court has recognized that exigency may require a seizure of a container if probable cause exists as to its contents, the seizure is only permitted "pending issuance of a

warrant to examine its contents." *Place*, 462 U.S. at 701.  The
Fourth Amendment does not necessarily permit a pat-down search of
a container just because the search is based on reasonable
suspicion.[10]  Even if such a pat-down search was permissible,
there is no evidence that the police conducted the search because
the bag presented a specific danger to their safety which is a
prerequisite to conducting a *Terry* pat frisk to begin with.
Moreover, the bag was far removed from Childs' presence when the
police felt the exterior of it.

The Government's reliance or probable cause based on the
information from the CI serves to emphasize the fact that the
police had the time and information to seek out a warrant, rather
than conduct a warrantless search.  No attempt to secure a
warrant was ever made.  Therefore, I conclude that the plain feel
exception does not justify the search of the bag conducted by the
police during the search of Tubbs' apartment.

---

[10]Courts within the First Circuit have apparently not
extended the plain feel doctrine such that pat downs of closed
containers are permissible.  Research has disclosed only one case
that involved the application of the plain feel doctrine in a
situation other than a pat-down of the body of a suspect.  *See*
*United States v. Robinson*, 999 F. Supp. 155, 161 (D. Mass. 1998).
In that case, the defendant moved to suppress a semi-automatic
weapon that police found wrapped in a towel on a windowsill while
conducting a warrantless search.  However, Judge Keeton expressly
distinguished this situation from those involving closed
containers.  *Id.* (explaining "[w]rappping something in a towel,
or hiding it behind a window shade for that matter, do not
implicate the heightened expectation of privacy that is
associated with closed containers").

b.    Abandonment

The Government separately argues that Childs abandoned the bag when he left 34 Coburn Street on the night of June 29, 2006. It is true that the warrant requirement does not normally apply to searches of abandoned containers.  *Abel v. United States*, 362 U.S. 217, 240-41 (1960).  However, I find as a matter of fact that Childs did not abandon his bag.  When Tubbs was directly questioned about whether she believed Childs had abandoned the bag by leaving the apartment without it, she clearly indicated that he did not.  Other evidence also suggests that Childs did not abandon the bag.  When Childs first walked into Tubbs' apartment at 7:20 p.m. on the night of June 29, 2006, the police did not observe either he or Brewer carrying the bag with him. Thus, presumably Childs had left the bag at 34 Coburn Street at some earlier point in time.  From this fact, the reasonable inference to be drawn is that Childs did not abandon the bag merely by leaving the apartment again at 9:20 p.m.

The Government relies on *United States v. Tolbert,* 692 F.2d 1041 (6th Cir. 1982), to support its argument.  I find the case to be inapplicable because there the defendant expressly disclaimed ownership of narcotics-containing luggage.  *Id.* at 1044-45.  Here, Childs did not expressly disclaim ownership of his black bag in any way.  Thus, I find that the record does not support the proposition that Childs abandoned his bag.

5.   Conclusion

Because Childs has established that he had Fourth Amendment
standing and the Government did not show that the warrantless
search was justified, I conclude that the bag and its contents
must be suppressed.  I also conclude that any communications,
verbal or non-verbal, made by Childs after he learned that the
bag and firearm had been discovered by police at 34 Coburn Street
should be excluded.  The Defendant's reactions, upon learning of
the firearm as described in Officer Smith's police report, are
inadmissible because they followed and are tied to the illegal
search of the bag.  Under fruit of the poisonous tree doctrine,
"evidence obtained directly or indirectly from a violation of the
Fourth Amendment is not admissible against an accused at trial."
*United States v. Bienvenue*, 632 F.2d 910, 913 (1st Cir. 1980)
(citing *Wong Sun v. United States*, 371 U.S. 471 (1963)).  There
was no break in the chain of events sufficient to refute the
inference that Childs' communicative acts were a product of the
illegal search.  *See United States v. Rivas*, 157 F.3d 364, 368
(1998) (citing *Brown v. Illinois*, 422 U.S. 590, 602-03 (1975)).
Smith's report states that Hilliard, who took part in the search
at 34 Coburn Street, called Smith, who then relayed the
information to Childs, who was present and in custody.  The
statements describing Childs' reactions upon hearing the news
must be suppressed.

C.   *Suppression of Childs' Statements Following*
     *the July 5, 2006 Arrest*

The Defendant also seeks to suppress certain statements that he made following his arrest on July 5, 2006, including statements relating to the events of June 29, 2006.  Childs contends suppression is appropriate because he was not informed of his *Miranda* rights when he was first arrested and did not waive his *Miranda* rights at the time of his arrest or after he was taken to the police department.

1.  Legal Standards

An arrest involving custodial restraint and interrogation requires warning the defendant of his Fifth Amendment rights against self-incrimination.  *United States v. Maguire*, 918 F.2d 254, 261-62 (1st Cir. 1990). Under *Miranda*, interrogation

> refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.  The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.  This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.

*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  The standard is an objective one, but limited to "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 302 (emphasis in original).

A defendant may waive his *Miranda* rights, but only after he was fully informed of those rights and the waiver is made voluntarily, knowingly, and intelligently.   *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The standard to determine whether a statement is truly voluntary and not coerced has two prongs; first, the waiver must have been a product of a free and deliberate choice rather than intimidation, coercion, or deception, and second, the waiver must be accompanied with a full awareness of the nature of the right being abandoned and the consequences of that abandonment. *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).   The burden is on the Government to prove, by a preponderance of the evidence, that the defendant waived his *Miranda* rights.   *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

> 2.   Informing Childs of *Miranda* Rights After He
>      Was Arrested

The record satisfies me that Childs did receive *Miranda* warnings following his arrest at 42 Ford Street.   Officer Gaucher testified that he read Childs his *Miranda* rights following his arrest and after Childs had been placed in a police cruiser. This testimony comports with Gaucher's report from the night of July 5, 2006.   Childs offered nothing to establish the contrary. Therefore, I conclude that he did receive his *Miranda* rights upon his arrest outside of 42 Ford Street.

> 3.   Childs' Specific Post-Arrest Statements

a.   "Make it go away" and Related Statements

After the baggies on Childs' body were discovered at the police station, Childs pleaded with the police to "make it go away" and stated that he was on probation and could not do a two-year mandatory sentence.  I find these statements to have been made voluntarily and not as a result of police interrogation. The evidence shows that Childs made this first series of statements directly following the discovery of narcotics in his anal cavity.  While Childs was confronted with the narcotics by this discovery, "[c]onfrontation with incriminating evidence does not amount to coercion." *Johnson v. Hall*, 605 F.2d 577, 582 (1st Cir. 1979).  After discovering the baggies of contraband, the police did not ask Childs any questions or make any other statements to him.  Rather, Childs spontaneously reacted to their discovery.  Thus, these statements are properly viewed as voluntary and not in response to any interrogation.  Therefore, these statements are admissible.


b.   "His boy was going to take the rap" Statement

Following Childs' plea for leniency, Gaucher told Childs that he had an open case and that his "best chance is to work with Detective Smith."  Gaucher added that Childs might be able to "work out a deal with [Smith]."  In response, Childs said he was not worried about the gun case because "his boy was going to

32

take the rap for him on that."

I find that Officer Gaucher's words constituted an interrogation.  Specifically, Gaucher's reference to Officer Smith, Childs' arresting officer for the earlier firearms charge and an officer who was not involved in the July 5, 2006 arrest, was a gratuitous statement made unrelated to the arrest and custody.  *See United States v. Reyes*, 434 F.Supp.2d 58, 66 (D. Mass. 2006) (statements made by defendant in response to agents' superfluous questioning not normally attendant to arrest and custody were suppressed).  This reference to the prior firearm incident, unrelated to the issue at hand, and its potential for providing an avenue to more favorable treatment, was reasonably likely to elicit an incriminating response from the suspect.

That is not the end of the inquiry.  Childs' statements could still be admissible if the Government can prove that Childs adequately waived his *Miranda* rights.  However, the Government has not met its burden in this regard.  The record does not indicate that the officers sought or Childs gave an express oral or written waiver of his *Miranda* rights in connection with this aspect of the interrogation.  It is true that an explicit waiver is not always necessary to support a finding that the defendant waived his *Miranda* rights.  *See North Carolina v. Butler*, 441 U.S. 369, 375-76 (1979).  However, the only evidence the Government offers to show Childs voluntarily waived his *Miranda*

33

rights is his past history as a criminal defendant.  According to the Government, Childs was familiar with the scope of his constitutional rights based on past encounters with law enforcement.  I find that the Government has not introduced enough evidence to validate the presence of the *Moran* factors in this case at the time the interrogation turned to the firearms violation.  Thus, I will suppress this portion of Childs' post-arrest statements dealing with the firearm and "his boy" made to the Brockton police at a time when the record establishes that he did not knowingly waive his rights with respect to the firearm charges.

## III.  CONCLUSION

For the foregoing reasons, I GRANT in part and DENY in part Childs' motion to suppress.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

34